IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>      v.<br><br>EARNEST LEE HAMILTON, aka<br>EARNEST L. HAMILTON,<br><br>                  Appellant. | No.  87272-9-I<br><br>ORDER GRANTING MOTION<br>FOR RECONSIDERATION,<br>WITHDRAWING OPINION,<br>AND SUBSTITUTING<br>OPINION |

Respondent State of Washington moved for reconsideration of the unpublished opinion filed on November 24, 2025.  Appellant Earnest Hamilton filed an answer.  The panel considered the motion pursuant to RAP 12.4 and determined that the motion should be granted, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the respondent's motion for reconsideration is granted; and it is further

ORDERED that the unpublished opinion filed on November 24, 2025, is withdrawn; and it is further

ORDERED that a substitute unpublished opinion be filed.

_____

_____

_____, ACJ

Chung, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87272-9-I |
| Respondent, | |
| v. | DIVISION ONE |
| EARNEST LEE HAMILTON, aka EARNEST L. HAMILTON, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — Ernest Hamilton lived in Apartment 102 at Prairie Oaks Apartments in Lakewood, Washington. On March 24, 2023, Lakewood Police Department officers responded to an active shooter report at Prairie Oaks. When the officers arrived, a babysitter, T. Hale, was outside the apartment complex, holding L.A., a three-month-old infant who lived in Apartment 101. L.A. was bleeding from three different locations on the right side of their head. Hale reported that bullets hit the child's swing when the apartment was shot at multiple times. Officers observed blood inside and outside of Apartment 101, and damage to the apartment's windows and exterior door. After searching the complex, officers found rifle magazines, parts of a gun, and rounds in Hamilton's apartment. Hamilton was found guilty of three counts of assault in the first degree and unlawful possession of a firearm in the first degree. Hamilton appeals.

Finding no error, we affirm.

FACTS

In March 2023, Ernest Hamilton lived in Apartment 102 at Prairie Oaks Apartments in Lakewood, Washington. On March 24, 2023, at approximately 5:45 p.m., Lakewood Police Department officers responded to an active shooter report at Prairie Oaks. When the officers arrived at the scene, a babysitter, T. Hale, was outside the apartment complex, holding L.A., a three-month-old infant who lived in Apartment 101. L.A. was bleeding from several locations on the right side of their head. Hale reported that L.A. was shot when bullets hit the child's swing, while the apartment was being shot at multiple times. Hale did not see the shooter. Detective Darin Sale observed fired cartridge cases in the hallway between Apartments 101 and 102, bullet holes on Apartment 101's exterior walls, and bullet holes in Apartment 101's exterior door. Detective Sale also observed bullet holes in Apartment 101's windows.

Officers searched Apartment 102, and Officer Kaybree Cooper testified she observed a M4 magazine with four live rounds on a bar stool that was next to the bedroom and the living room. Sometime during or after the secondary clearing of the apartment complex, Officer Sean Urckfitz collected the magazine, and it was booked into evidence. Officers then obtained a search warrant for Apartments 101 and 102. Inside Apartment 102, officers found shell casings, several rifle magazines, and parts to an AR rifle. Detective Sale testified that a small bag with several magazines was in a chest of drawers. Hamilton's wallet, along with his identification, was on top of the chest of drawers. The rounds in the magazines found in the apartment were the same style of ammunition found

2

at the scene. The cartridges found outside Apartment 101 and the rounds found in Hamilton's apartment both had the same red coloring on the headstamp.

### Hamilton's Statements

Shortly after the shooting, Hamilton called 911, claiming that he heard shots in the hallway while he was in his apartment. While on the phone with dispatch, he mentioned that he needed to call his girlfriend. Hamilton then left the scene, asking a neighbor, Nicole Schultes, for a ride to his girlfriend's apartment. While on route to his girlfriend's apartment, Hamilton told Schultes that people were watching and listening to him in the apartment, and that he feared for his life. Hamilton also stated that he could hear "them" through the walls.

Hamilton was detained at his girlfriend's apartment, and officers placed him in the back of their patrol car. Officer Natalie Zieber testified that Hamilton's demeanor was "a little bit paranoid about people being after him." Hamilton stated that people were recording him and there was a hit on his life. After he was taken into custody, Hamilton told detectives that earlier that day, he heard his neighbors on both sides "cocking guns," and that his neighbors conducted surveillance on him. Hamilton stated that he heard people saying, "it had to be a head shot."

### Prosecutor's Closing Argument

During the trial's closing arguments, the prosecutor stated, "so, in your deliberations, you might just ask yourself, based on the evidence that was presented or lack of evidence, what was—what suggests Mr. Hamilton was not

the shooter?" Hamilton objected, claiming the statement shifted the burden of proof. The court overruled Hamilton's objection. The State then continued, "what I'm suggesting to you is the evidence proves beyond a reasonable doubt that he was the shooter. And that's not just based on one thing. It's based on many pieces of circumstantial evidence working together for you to form that conclusion." The State finished its closing argument, and the jury was excused for deliberation. Hamilton was found guilty of three counts of assault in the first degree and unlawful possession of a firearm in the first degree. Hamilton appeals.

ANALYSIS

<u>Sufficiency of the Evidence</u>

Hamilton asserts that the State's evidence was insufficient to prove identity and intent.

Under a sufficiency of the evidence claim, the court must assess whether "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Brooks*, 107 Wn. App. 925, 928, 29 P.3d 45 (2001).

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, "any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). This court draws all reasonable inferences from the evidence in the State's favor and "interprete[s] most strongly against the defendant." *Salinas*, 119 Wn.2d at 201. A defendant claiming insufficiency admits the truth of the State's

4

evidence and all reasonable inferences drawn in favor of the State, with circumstantial evidence and direct evidence being equally reliable. *State v. Pedro*, 148 Wn. App. 932, 951, 201 P.3d 398 (2009) (citing *Salinas*, 119 Wn.2d at 201). We will only reverse "where no rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt." *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

<u>Sufficient Evidence that Hamilton was the Shooter</u>

Hamilton asserts that the State's evidence was insufficient to prove that he was the shooter.

When the shooting occurred, Hamilton was in his apartment. Schultes testified that Hamilton's girlfriend was not at home at the time of the shooting.[1] Police body worn camera footage showed Hamilton exiting the building after the shooting.[2] Furthermore, officers found shell casings, several rifle magazines,

---

[1] During trial, Schultes was asked if she knew who Hamilton's girlfriend was. She answered, "absolutely, yes Nikki." RP at 677. Nelson then asked about Schultes' interaction with Hamilton after the shooting, "was Nikki there at this time?" RP at 677. Schultes responded, "no." RP at 678.

[2] Because this court was unable to play exhibit 140 in its submitted format, the State moved to return the exhibit to the trial court so the issue could be addressed. The request was made after the parties could not reach an agreement on supplementing the record with a copy of exhibit 140. A sufficiently complete record does not necessarily require " 'a complete verbatim transcript.' " *State v. Waits*, 200 Wn.2d 507, 510, 520 P.3d 49 (2022) (internal quotation marks omitted) (quoting *State v. Tilton*, 149 Wn.2d 775, 72 P.3d 735 (2003)). When an appellate court is faced with a defective or incomplete record, "alternative methods are permissible if they permit effective review." *Waits*, 200 Wn.2d at 510.

The issue is whether the record is sufficient to permit effective review. In its brief, the State cites to exhibit 140 to assert that the apartment surveillance footage showed four points: (1) no one entered or exited the apartment's main entrance right before the shooting, (2) no one was seen entering or exiting

and parts to an AR rifle in Hamilton's apartment. Hamilton's wallet and identification were on top of the chest of drawers that contained several magazines. The magazines found in the apartment were the same style of ammunition found at the scene. Additionally, the rifle cartridges found outside Apartment 101 had similar red headstamps to the rounds found in Hamilton's apartment. Given the circumstantial evidence, any rational trier of fact could have found Hamilton guilty beyond a reasonable doubt. The court did not err.

<u>Sufficient Evidence of Specific Intent</u>

Hamilton argues that even if the State proved that Hamilton fired the gun, the State proved insufficient evidence that Hamilton had specific intent to harm someone inside Apartment 101.

In determining whether a defendant intended to inflict great bodily harm, "a jury may consider the manner in which the defendant exerted the force and the nature of the victim's injuries to the extent that it reflects the amount or degree of force necessary to cause the injury." *State v. Alcantar-Maldonado*, 184 Wn. App. 215, 225, 340 P.3d 859 (2014) (*citing State v. Pierre*, 108 Wn. App. 378, 385, 31 P.3d 1207 (2001)). While the court cannot presume specific intent, "it can be inferred as a logical probability from all the facts and circumstances." *State v.*

Hamilton's apartment from the rear door prior to or after the shooting, (3) Hamilton left his apartment approximately nine minutes after the shooting, and (4) when Hamilton left, he was alone. Although the court is unable to review exhibit 140, the State's assertions about the exhibit are supported by the testimony of Brittney Stricklan and Detective Latimer. In addition, the photo exhibits 131 and 132 and the video exhibit 136 provide similar views addressed by the testimony and exhibit 140. The record contained an equivalent report of the events and was sufficient to permit effective review by this court. Therefore, the State's motion to supplement the record is denied.

*Pedro*, 148 Wn. App. at 951. "Specific intent is defined as intent to produce a specific result, as opposed to intent to do the physical act that produces the result." *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). "Once the specific intent to inflict great bodily harm is established, this intent may transfer to any unintended victim." *Elmi*, 166 Wn.2d at 217.

Hamilton knew a family lived in Apartment 101. After Hamilton was detained, he mentioned to multiple law enforcement officers that people were after him and his life was in danger. Hamilton thought his neighbors were doing surveillance on him and heard them "cock[] guns" earlier that day. Hamilton also mentioned wanting to hurt his neighbors and his girlfriend, and wanting to commit a crime so he could go to jail. The evidence supports that Hamilton had the specific intent to inflict great bodily injury. Hamilton's specific intent to harm his neighbor transferred to L.A. when he was shot. The trial court did not err.

Prosecutor's Statement in Closing Arguments

Hamilton claims his right to a fair trial was violated because the prosecutor committed misconduct during closing argument.

"Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." *State v. Brett*, 126 Wn.2d 136, 174, 892 P.2d 29 (1995). When the defendant claims prosecutor misconduct, "the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality opinion)). To prevail on this claim, "a defendant is required to

show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers. Restraint of Glasmann,* 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion). A statement is prejudicial if it "had a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Our Supreme Court has held that "it is improper for the prosecutor to argue that the burden of proof rests with the defendant." *Thorgerson*, 172 Wn.2d at 453. Our court has found that it is improper for a prosecutor to misstate the reasonable doubt standard and impermissibly undermine the presumption of innocence. *Emery*, 174 Wn.2d at 759-60.

We consider the alleged prosecutor misconduct in the context of the State's closing argument in its entirety. Before making the objected statement, the State listed the elements of the charges, stating "these are the things that need to be proved beyond a reasonable doubt, nothing more, nothing less." After detailing the evidence that Hamilton was the shooter, the State articulated its burden of proof

> So given all of that evidence, both direct and circumstantial
> evidence, I suggest that you would find and will conclude that
> Mr. Hamilton is the one who shot those rounds into Apartment 101.
> And if you do that, you will also find beyond a reasonable doubt that
> he has committed the charged offenses of Assault in the First
> Degree and Unlawful Possession of a Firearm in the First Degree.

The State correctly stated its burden of proof before making the objected statement.

Additionally, Hamilton argued in his closing argument that somebody else may have been the shooter, stating, "what if somebody else fires the gunshots in the hallway from [sic] apartment whatever else, manages to leave through another exit, takes it out some other time, takes it out, puts it in the truck, who knows, disassembles it." The State's phrase, "you might just ask yourself, based on the evidence that was presented or lack of evidence, what was—what suggests Mr. Hamilton was not the shooter," was in response to Hamilton's argument that there could have been another shooter. And the State immediately followed up by stating that it was suggesting to the jury that the evidence proves beyond a reasonable doubt that Hamilton was the shooter.

Even if the statement was improper, the prosecutor's statement did not have a substantial likelihood of affecting the jury's verdict. At trial, an abundant amount of evidence supported the State's contention that Hamilton was the shooter. Hamilton had shell casings, several rifle magazines, and parts to an AR rifle in his apartment. The magazines and rifle cartridges found at the scene outside Hamilton's apartment were like the magazines and cartridges found in Hamilton's apartment. No misconduct occurred in the State's closing argument and even if it had, no prejudice would have resulted.

<u>Statement of Additional Grounds for Review</u>

In Hamilton's statement for additional grounds, Hamilton contends that the M4 magazine was seized in violation of his fourth amendment rights, and it was not a product of the search warrant.

9

The federal and Washington State constitutions prohibit unreasonable searches. *State v. Muir*, 67 Wn. App. 149, 151-52, 835 P.2d 1049 (1992). A warrantless search may be lawful if exigent circumstances exist. *Muir*, 67 Wn. App. at 152. Circumstances include when " 'there is strong reason to believe that the suspect is on the premises' " and police "reasonably believe persons are in imminent danger of death or harm." *Muir*, 67 Wn. App. at 152-153 (quoting *State v. Terrovona*, 105 Wn.2d 632, 644, 716 P.2d 295 (1986)). Another exception to a warrantless search is the plain view exception, which requires "(1) a prior justification for intrusion, (2) inadvertent discovery of incriminating evidence, and (3) immediate knowledge by the officer that [they] had evidence before [them]." *State v. Kull*, 155 Wn.2d 80, 85, 118 P.3d 307 (2005). "The 'plain view' doctrine applies after the officer intrudes into an area or activity where a reasonable expectation of privacy exists." *State v. Lemus*, 103 Wn. App. 94, 102, 11 P.3d 326 (2000) (quoting *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). "If the officer has made a justifiable intrusion and sights contraband, [they] can seize the evidence without a warrant." *State v. Lemus*, 103 Wn. App. at 102 (citing *Seagull*, 95 Wn.2d at 901–902).

Sergeant Ryan Moody testified that when they arrived on the scene, officers cleared the structure to look for potential victims and find the shooter. The warrantless search was lawful under the exigent circumstance exception. In addition, during the secondary clearance, Officer Cooper testified that she saw an M4 magazine on a bar stool in Hamilton's apartment. The magazine was in plain view when police entered the apartment, therefore it was the result of a

10

legal search and properly seized.  The items seized were the result of a legal search.

We affirm.

_____

WE CONCUR:

_____    _____, ACJ